We have Schneider and Harris v. HHS. The court has instructed counsel to combine the arguments because of the similarity of both the facts and the legal issues. And we have provided 20 minutes per side. As I understand it, Mr. Johnson, you want to start with 14 minutes and reserve six total for rebuttal. Yes, ma'am. Okay. And Mr. Pepper and Ms. Shin-Kaplan, you're going to divide your time 15 and 5. Is that correct? Correct. Okay. Respectively, right? Correct. Okay. All right. Mr. Johnson, I'm sorry, let me give the case numbers 13-5068 and 13-5072. You may begin. Thank you, Your Honor. Good morning. May it please the Court. The special master in these cases found that the government convincingly proved that SDN1A gene mutations were the sole cause of the seizure disorders at issue, and that the DTaP vaccine, therefore, necessarily played no causative role. This court, in three prior cases, Stone, Hammett, and Darabault, has upheld the special master's findings that the government proved that the SDN1A mutations in those cases was the sole cause of the children's seizure disorder. The government's evidence in Stone, Hammett, and Darabault was materially the same that was offered in these cases, specifically the expert opinions of the government's expert geneticist and pediatric neurologist, Dr. Raymond. Petitioners have failed to show that these cases are illegally or factually distinguishable from Stone, Hammett, and Darabault, and we therefore ask this court to set aside the opinions of the Court of Federal Claims and reinstate the decisions of the special master. Now, the petitioners refer to Stone and Hammett, at least, and say that it's distinguishable on the ground that the McIntosh reference was not before the court, but it wasn't clear to me how McIntosh made a difference that was helpful to the petitioners here. We agree, Your Honor. We believe that the McIntosh article and the government's experts in these cases actually testified that the McIntosh article supports the government's position. The McIntosh article was essentially a follow-on study to the Berkovic study that was at issue in Stone and Hammett, and that was a study that looked at children who had been diagnosed with seizure disorders and determined that those children actually had SCN1AG mutations, and so the Berkovic study said, well, maybe the vaccines, even though some of the children had their initial seizure and temporal association with the vaccination, the vaccine wasn't actually the cause. The McIntosh... I'm sorry. Just to interrupt you for just a moment so that I have my timeline here. When was SCN1A gene and its effects, when was that first discovered? It began to appear in the literature in the early 2000s, and it's only in the last decade that more and more research has been done, and as the research has developed, there's an animal model that has been outstudied that are referenced in the record that have been used to look at how the SCN1A mimics in mice, what effects that has, and then there have been these human studies, McIntosh being one, which looked at in these children that have SCN1A gene mutations, the McIntosh study in particular looked at whether having the initial seizure and temporal association with the vaccination had any effect on the clinical outcome in these children, and following these children, the McIntosh study had two groups, the vaccine temporal and the vaccine distant groups, and in looking at the two groups, the authors of the McIntosh study found that there was no difference in the clinical outcome in these children. Is the fact of a gene mutation as something that might be indicative of someone who could develop a condition the same as proving causation? The government expert's testimony in this case was that this particular mutation, based on the scientific evidence that's available, is sufficient to prove causation. Wasn't the word invariably used? Inevitable, invariably destined. Again, this was based on, in large part, the mouse studies. There were the You and the Oakley articles that are referenced in our briefs and that were testified about by the government's experts. These are studies that follow or that look at genetically modified mice. They've had a portion of their SCN1A gene knocked out so that it mimics what happens when humans have a mutation in their SCN1A gene, and the Oakley study was the first study that was testified about by the government's experts. It looked at what happened when you took these mice and you raised their temperature. You artificially heated them. What happened is that for a certain period right after the mice were born, there's a certain period in early development where they wouldn't seize, but after they reached a certain point, they began to have seizures. The Oakley articles took to the proposition that there is a temperature dependent to these mutations. Isn't raising the temperature in and of itself a cause? Well, not necessarily, because what the You article talks about, this was a prior study that had been done out of the same lab, looked at these same types of mice, did not heat them, and these mice actually went on to have spontaneous seizures without any temperature elevation. Based on looking at those two studies, the government's experts testified that was reliable evidence that regardless of whether a child is subjected to a fever or some other artificial temperature elevation, the mutation is destined to result in seizures at some point. The fever may move up the timing of the initial seizure, but again, based on the McIntosh study, moving up the time of the initial seizure doesn't have any effect on that. Can there be an initial seizure in the absence of a fever? Yes. The studies also showed that only about a third of the children who have STM1A mutations and have Dervais syndrome have their initial seizure in the presence of a fever. The fever is not a necessary factor that's required to trigger the initial seizure. The genetic mutation in and of itself is sufficient to cause a seizure. Do you believe that testimony supports the conclusion that the seizure disorder would have onset within the first two years of life for everyone with that gene? That's a point that I want to emphasize. The Court of Federal Claims found that the special master erred in finding the government proved alternate causation because, I quote, there is no evidence in this record, scientific or otherwise, that establishes that a child with a STM1A mutation necessarily will develop SMEI or GFS plus or another seizure disorder. That is actually an accurate statement of the government's position and an inaccurate framing of the government's burden. It was not the government's burden in this case to prove that every single STM1A mutation will necessarily result in a seizure disorder. In fact, hearing Dr. Raymond testify that there are certain types of STM1A mutations that are benign or silent and won't result in disease. These are the single nucleotide polymorphisms or SNPs that he testified about. What the government argued in this case was that the specific STM1A mutations in these two children were necessarily going to cause them to have a seizure disorder. That was based on Dr. Raymond's testimony that, as a clinical geneticist, he looks at various factors including whether the mutation was de novo or not, where on the gene the mutation is located, whether it's in a highly conserved region that's going to affect the child. He's going to look at whether the mutation results in a change in the amino acid that's generated by the gene. If it's a change in amino acid and there's a large difference in the type of amino acid and the function of the amino acid, then he would expect to see the mutation result in disease. Then he also looked at whether the mutation has been reported previously in the medical literature and whether that mutation has been associated with disease. In both of these cases, the exact same mutations that each of these children had have been previously reported. In both of those cases, the clinical outcome was comparable, was similar to the children in these cases. I'm sorry, you can finish it up. To wrap this up, in looking at those factors, Dr. Raymond was able to conclude that these specific mutations were going to cause these children to develop their seizure disorders. The principal issue in the case was the sole cause finding. I take it that this mutation was the sole cause of the illnesses that were contracted by these children and that the vaccine had no effect. It might have had a temporary effect on an initial seizure, but it had no effect on the ultimate condition. We've been talking about inevitability here. Is inevitability a necessary part of the sole cause analysis? I don't know that inevitability is necessary to the sole cause analysis. I also want to make sure that I'm not giving the impression that we believe that the government's burden is to prove alternate causes, that an alternate cause is the sole cause. In Darabo, this court made clear that the government's alternate causation burden is basically the same as the petitioner's burden in proving causation effects. In other words, the government has to prove by a preponderance of the evidence that some factor other than the vaccine is the actual cause of the injury, such that the vaccine is not a substantial cause. I'm not sure I understood what you just said. Are you saying that you weren't obligated to prove that there was a different cause other than the vaccine, parenthesis, and in this case, the other cause was SCN1A? The facts of this case and the scientific evidence that's available with respect to the SCN1A gene allow the government's experts to conclude that the seizure disorders in these cases were inevitable as a result of the genetic mutation. There may be facts in other types of cases where the government offers an alternate causation defense where it's not necessary to prove that the condition was inevitable. There can be other types of alternate causation, such as a virus or... What I don't understand is, suppose a study came out tomorrow and it said, well, we don't look for SCN1A mutations in kids that don't have this condition. But now that we did a study and we looked around, we did a control group, and we determined that 30% of the people with these types of SCN1A mutations do not have either of the two conditions at issue here, that wouldn't necessarily be inconsistent with saying that with respect to these individuals or other individuals who have the condition, that are in the 70%, that the gene was the sole cause. Yeah, absolutely. Dr. Raymond testified at the hearing that he wasn't aware of any literature that... Let me phrase it this way, that if he were aware of a reported mutation that was exactly the same as one of the mutations in these cases, and the child did not have a seizure disorder, then that might cause him to alter his opinion. But the fact is, there was no such evidence. And there are databases of individuals who have SCN1A mutations that don't result in disease, and those are the polymorphisms. So Dr. Raymond, he conceded that there can be mutations that don't necessarily result in disease, but based on his analysis of these specific mutations, that was what allowed him to conclude that it was inevitable. Could I return you to the point you were making earlier, which I didn't understand what you were saying. You said it wasn't the government's burden to prove that SCN1A was the sole cause of these children's condition. The government was able, based on the evidence in these cases, to prove that the mutation was the sole cause. But as a general matter, the government's burden on alternarchization, as articulated by this court in Darabo, is to prove that some factor other than the vaccine was the actual cause. But the only factor that the government presented by way of proof in these cases as the other cause, as the alternative cause, was the SCN1A, correct? Yes. So in this case, it would not be correct to say that the government didn't have the burden of proving that SCN1A was the sole cause of the conditions suffered by these two children, correct? The sense that the government's argument was that the genetic mutation was the sole cause of the child's injury, then that was what the government sought to prove, and that is what the special master found. And that's what the government needed to do, correct? In these cases, correct. Okay. I just thought you said the contrary. I thought you said the government didn't need to prove that as part of its proof. No, I'm sorry. If I wasn't clear, I was meaning to say that in other cases where the evidence is different or the government's position on the alternarchization is not based on a genetic mutation. Mr. Johnson, you need a blackboard and a Venn diagram. Right. Your Honor, unless there are other questions, these were not closed cases. There is, as I said, a growing body of scientific literature regarding the role of SCN1A mutations in causing seizure disorders based on animal studies and on human studies. The special master was on solid ground in relying on these published peer-reviewed studies as presented by the government's expert. And just as in Stone, Hammett, and Darbo, the special master committed no error in finding the government's evidence more persuasive than Petitioner. Okay. I'll save the rest of your time for the rebuttal. All right. Mr. Pepper. Good morning, Your Honors. In these cases, the Court of Federal Claims had the legal authority to set aside the factual and legal conclusions of the special master and enter its own findings of fact and conclusions of law. The Court had this legal authority because the special master consistently applied a heightened standard of proof by requiring the petitioners to prove their case with scientific certainty rather than by a preponderance of the evidence. Let's assume that the special master accepted and that the petitioners proved to the requisite level of their affirmative prima facie case. Focusing entirely on the alternative clause part of the case, where did the special master go wrong? Well, the special master relied mainly on the two mouse experiments, Oakley and Yu, and he required a definitive statement that a fever was necessary to trigger these mutations. So in essence, he was requiring us to prove that by scientific certainty. Wasn't he really relying on expert testimony as opposed to the studies? And what I think your problem is, is that Dr. Kinsporn, when you review what he had to say in the master's analysis, was that he simply wasn't persuasive. He didn't have specific expertise in the field, he hadn't practiced for many years, and he conceded a lot as well. Well, the special master found Dr. Kinsporn to be unreliable because he was not a geneticist, but he didn't discuss that he had substantial training in gene-related disorders. And he also found him unreliable because he required consistently scientific certainty. Dr. Kinsporn's opinions were supported in literature on many occasions. Dr. Kinsporn is asked whether the seizure disorders in this case would not have been manifest absent the receipt of the DTAP, and he says, I have no knowledge of that. Well, what the special master, and that's in the context that he was applying the loving test, and he was asking, in evaluating a significant aggravation case, special masters should consider how the underlying pre-existing disease affected the person's health. And he continually asked Dr. Kinsporn how the conditions would be different developmentally had they not received the DTAP vaccines, and that's simply not something that can be known. What the proper question would be, would be, but for the DTAP vaccine, would these petitioners have suffered of seizure disorders? In the initial seizure, there's no dispute that the initial seizure was inseparable from all the seizures that followed. But the fact findings were that given not just the existence of the gene mutation, but the nature of this particular gene mutation, that these two claimants in fact would have suffered seizure disorders in the absence of that initial. And those are based on the databases of SCN1A mutations, and the same article that discusses the SCN1A mutations found that there were 695 mutations or alterations, 628 resulted in Drouvet syndrome, 19 others resulted in a severe phenotype. But there were 55 mutations that were benign polymorphisms, 22 mutations that had the significance as unclear. In addition, he based it on that individual that had a similar mutation and similar outcome for both petitioners. But he ignored other case reports where the similar mutation did not result in the same phenotype. So the evidence presented by the respondent merely shows the association between the SCN1A mutation and that particular phenotype. There's no evidence that shows that it's inevitable that an individual with a particular mutation will end up with a particular phenotype. Now, let me ask you the same question I asked your opposing counsel, that in your brief you distinguish Stone and Hammett on the ground that the McIntosh article was not before the court in those cases and in Devereux. McIntosh, after reading it and seeing the testimony about McIntosh, does not seem to me to support you. It really seems to me to be more supportive of the government. Is there some respect in which McIntosh should drive us to conclude that Stone and Hammett would have come out differently had the McIntosh article been before the court then? Well, the McIntosh article notes the striking temporal relationship between vaccination and the ultimate seizure disorder. So what it does is it implicates vaccination as an environmental factor that can cause a seizure disorder. Well, a seizure, but I don't understand it to be saying seizure disorder. In fact, the conclusion ultimately is that people should not be warned against vaccinating their children even in the SCN1A mutation situation, right? Well, also in this case, we followed the NCES 10-year follow-up, which was not filed in any of the Stone, Hammett, or Devereux. And the NCES 10-year follow-up found that children who suffered seizures for the first time shortly after Pertussis vaccine were 8.6 times more likely to suffer future seizures than those children who did not. Before you move on, McIntosh, and just correct me if this is a misreading of McIntosh, but just what it looked like to me they were saying, and they say it in the third paragraph, intellectual outcome did not differ between patients who received vaccinations after seizure onset and those who did not. I'm sorry, I'm reading the wrong... Vaccination might trigger early onset of Dravet syndrome. It's the next sentence. The earlier onset of Dravet syndrome in children who, because of an SCN1A mutation, are destined to receive, to develop the disease, but vaccination should not be withheld because we found no evidence that vaccinations before or after disease affect outcome. That seems pretty damaging to your case, does it not? In light of the NCES 10-year follow-up, I don't believe it does. Okay. And where's that in the record? It is, a portion of it is filed, well, it's in the appendix as it is. While you're looking, how's the follow-up related to McIntosh? Well, the McIntosh implicates vaccination as... I mean, are they directly related in some fashion? They're not directly related. So McIntosh is what McIntosh is. It is, and the special master ignored several relevant passages in McIntosh that support our proposition that there's a gene-environment interaction occurring. They say, if however the observation of the temporal association is valid, a gene-environment interaction might be occurring. We have confirmed in previous clinical reports that the onset of Dravet syndrome might occur shortly after vaccination. Right, but again, the passages that are talking about there being a connection to the environmental trigger say that yes, sometimes it's an earlier onset, but ultimately it's no different in terms of what the syndrome is. They use the verb destined. And the Court of Federal Claims found, and it was our position that the evidence submitted merely shows an association between a particular mutation and a seizure disorder. There's no way to predict the outcome just based on mutation alone. But even if we were to say that the Court of Claims findings might be supportable under an arbitrary and capricious standard if they were standing alone, the Court of Claims did not have the authority to set aside the special master's findings except by finding that they were arbitrary and capricious. Isn't that right? Well, she found that the special master applied a heightened standard of proof by requiring definitive proof in the medical literature. And in the vaccine program, either medical opinion or medical literature is required. And on every particular point, the special master required a definitive statement in the medical literature. Wasn't the special master entitled as an observer of the demeanor and the capacity of the witness to determine that one of the witnesses was less reliable? He can, yes. But an expert's testimony must be evaluated in light of the record as a whole. And in Moberly, this Court stated that credibility-based determination of reliability of an expert testimony is more persuasive when there's very little support for the opinion. And in this case, there was a wealthy evidence to support it, a preponderant evidence that the vaccination did, in fact, contribute to. You were going to point out to us where in the appendix the NCES follow-up study is. Is it in the appendix? Not the entire report. The entire report is 100 pages, but it was filed into the record. And relevant portions were filed into the court appendix. All right. Well, maybe Ms. Jen Kaplan can call us, potentially the particular pages, if she has time to find those pages, because I would like to look at that. As a follow-up to the NCES- We're moving into Ms. Jen Kaplan's time. Just one last point, if I may. The respondent of the special master relied heavily on the Berkovich article, which found out of 14 individuals with a vaccine encephalopathy, 11 were found with an SCN1A mutation. And Berkovich suggested that many of those children in the NCES study had a genetic predisposition via a SCN1A mutation, and this mutation acted alone. But if this mutation acted alone with no contribution from the DTaP vaccine, then there wouldn't have been a finding that individuals suffering a seizure after a vaccination were 8.6 times more likely to suffer future seizures. Thank you. All right. Ms. Jen Kaplan, we'll give you your whole five minutes, and if the government needs an extra minute, they can have it. Thank you, Your Honor. May it please the Court. Sylvia Jen Kaplan for the athlete, Frank Harris, on behalf of his minor child, Jordan. I'd like to address the McIntosh article first. Sure. This article was clearly published after the decisions in Stone and Hammond, and the issue that was in dispute in Stone and Hammond was whether the SCN1A mutation was the sole cause. And the government disputed the fact that there were any environmental triggers at all and attributed any differences in what is known as genotype-genotype correlation to two mosaicism. In other words, there's a leaky mutation. What McIntosh did was it found that because of the striking temporal relationship of a number of the patients who suffered seizures after DPT, and that the number was so high it could not be attributed to coincidence, that the DPT acted as a trigger for these children's SCN1A mutation to emerge. And that... A trigger, but not necessarily a trigger that resulted in a difference in ultimate outcome, right? Well, Your Honor... I mean, we all agree that DPT can cause fever, and that fever can cause seizures. But the critical question is, is it not, that whether the initial seizure caused by and associated with the DPT vaccination leads to a different outcome than there would have been absent the vaccination. And that's the point on which it seems to me McIntosh is unhelpful to you. You're absolutely correct, Your Honor. McIntosh does not really address that point, because McIntosh is not designed to address that point. However, what McIntosh does point out is that out of 120 patients who initially were reviewed for this study, the study population involved only 38 patients. Very small numbers of people. The 10-year follow-up to the NCES, they were able to follow up, if I remember correctly, with almost 800 children. So when you're dealing with a rare disorder, and you have a very small study population, you're going to need a much larger population to detect a rare risk. And where is that in the appendix, the follow-up study? The 10-year follow-up is contained at appendix 336 to 338. And that's simply the relevant portion discussing children who suffered a subsequent seizure disorder when they suffered their first seizure at the index illness, which is when the DPT was first administered. And as Ms. Tupper indicated, the incidence was 8.6 times higher in the children who suffered seizure disorders with the DPT than even with children who had seizures before the DPT. So that is statistically significant. But even more significant... Now, where does that number come in the record, the 8.6? It comes from appendix A338, Your Honor. Okay. And it's considered part of the appendix. It's under Chapter 10, and it's in the upper one-third of that page. Okay. Okay. And in addition, Your Honor, there was some further discussion about this. And what they indicated also is that of the children that were followed in the 10-year study, 1 in 3 had problems with the sequela that they examined, of which there were intellectual problems, motor problems, behavioral problems, among a few, as compared to 1 in 10 who did not suffer the seizure at the index illness. Now, McIntosh is also important in the respect that they're saying that the environment does affect this gene. And the respondent disputed that during the entire hearing, and this is the one article which they provided, which they filed, which supports Dr. Kittensworth's opinion that the environment does play a factor. You said environment. I want to understand what you're saying. So the environment affects the gene? Or the environment affects the outcome? The environment acts as a trigger to allow seizures. Okay, but the environment doesn't alter the gene? No. Okay. No. So is it your view that the earlier the onset of the first seizure, the more severe the disorder? Well, according to the tenure follow-up, that is indeed true, Your Honor. And if you look on page A337, under the summary, what it says is that the main predictive factors about whether a child is going to suffer sequela afterwards, and one of the factors it mentions is early age at onset of the illness. Now, both these petitioners, one suffered his first seizure at two months, and the other suffered his seizure at four months, at a time frame in which febrile seizures are not supposed to occur, similar to the mice study that was mentioned by the respondent. Physiologically, they cannot have febrile seizures, but these two children did. And I would like to also mention that with respect to... And did your expert testify to this correlation? The government's expert was cross-examined on this, and he had no response. Okay, but your own expert did not testify that there was, in fact, this correlation that the tenure study concludes exists? Looking through the hearing transcript last night, I didn't see it, Your Honor. He could have, but I can't... I was looking for other things. Okay. So this is the literature that supports that there is sequela with these children. But not only that, Your Honor, the government submitted the U article. It talked about the animal studies. The U article indicated that this SCM1A gene mutation is a susceptibility factor, and that's exactly what Dr. Kingsborn was testifying to, that while it may predispose a child to develop seizure disorder, it doesn't necessarily mean that it will occur at this particular point in time. Wait, wait, wait, okay. Stop with that clause. You say it doesn't necessarily mean it will occur, and then you say at this particular point in time, but does it mean that it necessarily will occur? That, again, too, is unknowable. But there's evidence contrary to that. There is some evidence contrary to that, Your Honor. But as Dr. Raymond indicated, these databases are being maintained. They're biased databases. They're biased in the fact that the only people that get tested are those who have the clinical signs and symptoms of SMEI. We don't know whether there are people out there who have this mutation and doesn't have a seizure disorder because they're not tested. And, matter of fact, this is a spectrum disorder. It ranges from children who have simple febrile seizures to SMEI, which is the most severe type of disorder. No child who has a simple febrile seizure will get tested. Now, with respect to Jordan Harris, Jordan Harris had a mutation that was predicted to be consistent with SMEI, the most severe type. He, in fact, has a more mild type of mutation. If this was inevitable, that the gene was the only cause of this child's disorder, he should have had SMEI, but he didn't. So the fact that there is no genotype-phenotype correlation here... Did I mishear you? I thought you said he, in fact, had a more mild type of mutation. I'm sorry. A more mild type of disorder on the spectrum. If I said that, I apologize. I didn't mean that. You're way beyond your time. Do you want to finish up? Yes. So to conclude, no genotype-phenotype correlation. The literature that was filed on behalf of the petitioner actually supports the petitioner's position. Thank you. I want to go to where Ms. Gencaplan sort of ended up, which is exactly where I started with you, which is, is this just indicative of the possibility that you will get a disorder or is it the cause of the disorder? And you said that it was the cause of the disorder. And there are a lot of women walking around out there with the BRCA2 gene and they don't get breast cancer. So are there people walking around with this gene mutation who don't get this disorder? And again, we need to distinguish between CM18 mutations generally and the specific mutations in these cases. The testimony from Dr. Raymond in these cases was that, in the case of Jordan Harris, he had a splice-type mutation, meaning that there was a mutation at the portion of the gene that tells the DNA how to replicate and when to stop. And because the mutation is in that portion of the gene, it was going to cause the gene to produce the protein that wasn't going to produce the protein that it needed to produce, which is the protein that's necessary for these sodium channels to operate. In the case of NF, his was actually a point mutation that caused a change in an amino acid being produced by the gene. And the change in the amino acids were so different that Dr. Raymond said it was ultimately inevitable that it was going to cause problems in the functioning of this gene, of this sodium channel. So your response to the tenure follow-up is that it may be true that the disorder can be triggered by the vaccine and can actually get worse because of an early trigger, but not in these particular cases? My response to the NCES and the tenure follow-up is that, first of all, those studies involved the DTP, the whole cell version of the pertussis vaccine. These cases involved the acellular version of the vaccine, the DTaP vaccine. And the DTaP vaccine has been shown to cause far fewer, far less frequent side effects than the older whole cell pertussis version of the vaccine. So many specialists have found that the NCES and the tenure follow-up studies simply aren't applicable in cases involving the DTaP vaccine because the vaccines are different. The second reason that our experts, the government's experts, didn't find the NCES particularly informative in these cases is that those studies were done, I believe the original study was done in the late 70s or early 80s. I think the follow-up was published around 1993. Those were a decade, two decades before that. Wait a second, follow-up, that's the study we have at A336? Yes. That was done in 93? I believe it was done in 93, but in any event, well before, knowledge of the STN1A mutation's role in causing these seizure disorders was known. So the investigators in those studies simply didn't look for STN1A gene mutations. So we don't know how many of those children actually had STN1 gene mutations, and that was the cause of the seizure disorders in those cases. So our experts, their response to those studies, to the NCES and the tenure follow-up, was that they aren't particularly informative in these cases. With respect to briefly just the Oakley and you studies, the petitioners argued that they support their cases. Obviously, our experts disagreed. Dr. Ken Forn, their expert, his testimony was all over the place with respect to those studies. He initially, when he was cross-examined, said that that study, the Oakley study, provided the strongest support for his opinion. But then after the government's experts testified, he came back and said that actually it wasn't a very good model. But then finally, at the very end of the hearing, the special master questioned him and said, you're saying now that this is not a good model. Dr. Raymond has said it's an excellent model. What is your response to that? Dr. Ken Forn's testimony was well referred to Dr. Raymond on that. So at the end of the day, Dr. Ken Forn essentially said that Dr. Raymond's testimony about those articles was more reliable.  And the special master noted this in his decisions. Dr. Raymond applied a methodology in these cases that he said is standard for clinical geneticists, that you look at the various factors, you use the various tools, what's known about genetics, looking at prior cases, that that's the methodology that clinical geneticists use to diagnose and counsel their patients. The special master noted that two of the articles in the record, the DePian article and the Berkovic article, both describe methodologies used by those authors that was, in essence, the same as the methodology applied by Dr. Raymond in these cases. In contrast, Dr. Ken Forn, as you noted, Judge Wallach, when he was asked how did these children look different as a result of the DTaP vaccine, would these children develop their seizure disorders absent receipt of the DTaP vaccine, all Dr. Ken Forn was able to say is, I don't know. Given that evidence, the special master was fully justified in finding the testimony of Dr. Raymond more persuasive. Let me ask you a background question here. We've had now, I guess, at least five of these ST and 1A cases in the last couple of years. How many of these cases are there pending, to your knowledge, before the special masters of the Court of Federal Claims? There are at least one or two that are pending. There is another case that actually was decided and affirmed by the Court of Federal Claims but was not appealed to this court. But we suspect that given the knowledge about this genetic mutation, that we will likely see more and more of these cases. Thank you. Anything else? All right, thank you.